IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

JASON WILLARD BRAMLETT                                                    PLAINTIFF

v.                                              Civil No. 6:19-CV-06070

WELLPATH LLC (formerly known as                               DEFENDANTS
Correct Care Solutions, LLC), DR. THOMAS
DANIEL, and DR. JEFFREY STIEVE
(Regional Director for WellPath, LLC)

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed pursuant to 42 U.S.C. § 1983.  Pursuant to the provisions

of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable Susan O. Hickey, Chief United States

District Judge, referred this case to the undersigned for the purpose of making a Report and

Recommendation.

Currently before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 57).

### I.  BACKGROUND

### A.  Procedural History

Plaintiff filed his Complaint on June 25, 2019.  (ECF No. 1).  He alleges his constitutional

rights were violated by the denial of medical care starting in March 2017 while incarcerated in the

Arkansas Division of Correction ("ADC").  (ECF No. 1 at 4).  Plaintiff states he suffers from

Multiple Sclerosis[1] ("MS") and has additional spinal column issues, including disc protrusions and

bulges, spurs, chondromalacia of the facet joints, degenerative disc disease, and osteophytes with

---

[1] "Multiple sclerosis (MS) is characterized by disseminated patches of demyelination in the brain and spinal cord. Common symptoms include visual and oculomotor abnormalities, paresthesias, weakness, spasticity, urinary dysfunction, and mild cognitive symptoms. Typically, neurologic deficits are multiple, with remissions and exacerbations gradually producing disability."  https://www.merckmanuals.com/professional/neurologic-disorders/demyelinating-disorders/multiple-sclerosis-ms?query=multiple%20sclerosis.  (Last accessed July 19, 2021).

foraminal stenosis. (*Id*.). Plaintiff alleges he was denied prescribed medical care, medications, treatments, disability-assist devices, and hygienic necessities for his conditions. (*Id*.).

More specifically, he alleges Wellpath engaged an MS specialist, Dr. Atiq, and a neurologist, Dr. Khaleel, to provide treatment for Plaintiff. (*Id*. at 8, 21). Plaintiff indicates he was also supported by the Spinal Cord Commission of Arkansas ("SCC"). (*Id*. at 8). These two specialists and SCC continue to work with Plaintiff. (*Id*.). Plaintiff alleges that Defendants suspended or otherwise disregarded the treatment plans of Drs. Atiq and Khaleel for months at a time over Plaintiff's protests. (*Id*.). These lapses in treatment resulted in Plaintiff suffering "regression and relapse with significant increases in the debilitating symptoms and in pain, at the hands of Wellpath, Daniel and Stieve." (*Id*. at 8-9). Plaintiff also alleges that Defendants also denied him hygienic supplies needed for his condition, resulting in a urinary tract infection.[2] He alleges Defendant Daniel ordered the wheelchair provided to him by SCC be confiscated, resulting in Plaintiff falling, missing meals, and missing medications. (*Id*. at 9). Plaintiff alleges there were many incidents where he was denied care, but he did not wish to try the Court's patience by listing them all. (*Id*.).

Plaintiff alleges the confiscation and the lapses in treatment were financially motivated as well as "vindictive retaliation" in response to his use of the ADC grievance process to protest their denial of medical care. (*Id*. at 9, 51, 55, 73).

Plaintiff also alleges his claims constitute a supplemental state claim for negligence and medical malpractice. (*Id*. at 6).

---

[2] "Most patients with MS have difficulty with bladder control (e.g., frequency, urgency, hesitancy, incontinence, retention)." https://www.merckmanuals.com/professional/neurologic-disorders/demyelinating-disorders/multiple-sclerosis-ms?query=Multiple%20Sclerosis. (Last accessed Jan. 8, 2020).

Plaintiff notes that many of these actions would be actionable under the Americans with Disabilities Act, but he chose not to name the ADC as a Defendant under the Act because it would increase the complexity of the case. (*Id*. at 10).

For the denial of medical care and retaliation claims, Plaintiff proceeds against Defendants in both their official and personal capacity. (*Id*. at 4, 5). For the state claim, he proceeds against all Defendants in their personal capacity. (*Id*. at 6). Plaintiff seeks compensatory and punitive damages. He also seeks declaratory and injunctive relief. (*Id*. at 7).

Defendants filed their Partial Motion to Dismiss on July 23, 2019. (ECF Nos. 10, 11). On July 24, 2019, the Court entered an Order directing Plaintiff to respond, and he did so on August 21, 2019. (ECF Nos. 18, 19). Plaintiff also filed his first Motion to Stay Tolling Provisions on August 21, 2019. (ECF No. 20). Plaintiff filed a second Response and Brief in Opposition to the Motion for Dismiss, a second Motion to Stay Tolling Provisions, and a Motion for Order on August 28, 2019. (ECF Nos. 21-25).

Defendants filed a Response in Opposition to Plaintiff's Motion for Order on September 11, 2019, but they filed no response to Plaintiff's tolling motions. (ECF No. 26). Plaintiff filed a Motion for Expedited Ruling on January 2, 2020. (ECF No. 27). On January 13, 2021, the undersigned entered a Report and Recommendation addressing Defendants' Partial Motion to Dismiss, as well as the other pending motions. (ECF No. 28). It was recommended that the Partial Motion to be Dismissed, as well as the other pending motions, be denied. (*Id*.). On January 31, 2021, the Report and Recommendation was adopted by Chief Judge Hickey. (ECF No. 29).

Defendants filed their Motion for Summary Judgment on December 30, 2020. (ECF No. 57). Defendants argue that summary judgment in their favor is appropriate because Defendants

were not deliberately indifferent as to Plaintiff's medical care, Plaintiff did not exhaust any grievances against WellPath, LLC, and there was no retaliation against Plaintiff.  (ECF No. 57).

Plaintiff filed his Response on March 5, 2021, after receiving an extension of time to file. (ECF Nos. 65, 66, 67).  Defendants filed their Reply on March 19, 2021, after receiving an extension to file.  (ECF Nos. 70, 71, 72).  Plaintiff filed a second Motion for Expedited Proceedings on July 12, 2021.  (ECF No. 73).

### B.  Relevant Grievances

Plaintiff provided copies of 19 ADC grievances with his Complaint, many of which were found to be "with merit" during the grievance process.[3]  Defendants provided an additional grievance, OR-17-01114, with their Response.[4]  (ECF No. 59-1).  These grievances will be grouped according to topic and administrative exhaustion status.

### 1.      Exhausted

### a.  Missed Tysabri Infusions

**OR-17-01114** (June 28, 2017).  Plaintiff grieved that Mrs. Hart told him he "needed to get a grip" and stop accusing her of not doing the paperwork for his shots.  Plaintiff states that he is overdue for his shot, and "she has screwed it up before."  "Having a provider that can't tell 1 from 5 is why people are dying around here."  The response indicates that Mrs. Hart stated that it is "stupid" that Plaintiff has a wheelchair when he has been seen ambulating around the day clinic. It also noted that Mrs. Hart is no longer employed with CCS, and a consult for his injection has

---

[3] The Court notes that several of these were found to be with merit at the initial stage of the grievance, but without merit at the final stage of the grievance because treatment or medication had been provided during the pendency of the grievance.  This appears to be a change in language formerly used by the ADC that a grievance was with merit but resolved.

[4] Plaintiff had numerous other grievances during the period relevant to this case, but they were not included in the record, as they were deemed to be unrelated to the allegations of this case.  (ECF No. 59-1 at 21).  Plaintiff has raised no objection.

been authorized.  The grievance was found to be without merit at all levels.  (ECF No. 59-1 at  24-26).

OR-17-01851  (October 30, 2017):  Plaintiff grieved that he had missed outside appointments necessary for his treatment, including the MS treatment he was to receive every four weeks.  He also had not been to see the neurologist.  The response indicates that, although there had been delays and reschedules, he had received all ordered appointments.  His grievance on this point was therefore without merit.  The response further notes he was seen on August 14, 2017, by Dr. Atiq who recommended a follow-up with neurologist Dr. Khaleel due to Plaintiff's increasing symptoms.  A neurology consult was entered on August 15, 2019.  Because Plaintiff had not yet seen a neurologist at the end of October, his grievance on this issue was found to be with merit.  The response also appears to indicate that some of Plaintiff's other treatments could not be authorized until he was seen by the neurologist.  (ECF No. 1 at 21-23).

OR-17-01956  (November 14, 2017):  Plaintiff's MS infusion treatment is to be received every 28 days.  His November 13, 2017, appointment was cancelled with no documentation as to why the cancellation occurred.  He did not receive the treatment until either December 8th or 11th, 2017.  Due to the delay, his grievance was initially found to be with merit, but then later found to be without merit because he was seen in December.  His MS infusions were discontinued, however, until he could be seen by the neurologist again.  (ECF No. 1 at 24-26).

OR-18-00160  (January 24, 2018):  Plaintiff grieved that he had not received his MS infusion and was having relapses.  The medical department acknowledged a delay in the treatments but stated he was now being treated.  Plaintiff indicated this was an ongoing issue since Daniel arrived, and Daniel told him he was "lucky to be getting anything."  The grievance was initially

found to be with merit due to the delay, but it was then found to be without merit because he had received treatment.  (ECF No. 1 at 27-30).

### b.  Delay or Denial of Medical Supplies and MS Treatment

**OR-17-01460** (August 23, 2017): Plaintiff grieved that Dr. Stieve and Dr. Daniel discontinued Plaintiff's prescribed pain medications.  The response indicated several changes of pain medication, including the severance of Tramadol by Stieve on August 22 and the provision of an alternative pain medication to the Tramadol on August 28.  The grievance was found to be with merit due to the delay in providing alternative pain medication, but it was considered resolved. (ECF No. 1 at 18-20).

**OR-18-01469** (November 19, 2018): Plaintiff grieved that Daniel is trying to cause him harm or death with his actions.  Specifically, Plaintiff grieved that instead of changing his pill call times, Daniel keeps taking him off all his MS medications and saying that Plaintiff asked him to do so.  Plaintiff refutes that he asked him to take him off his medication.  The medical department found Plaintiff's grievance to be with merit due to the lack of documentation indicating Plaintiff had requested a cessation of Tysabri infusions.  These were restarted.  The Response further notes that:

> You were seen by Dr. Daniel for chronic care on November 2, 2018 at which time he noted you reported not taking your medications due to the pill call times. You had an active, approved order for Ampyra 10 mg twice daily to be taken at AM and PM pill call.  Dr. Daniel discontinued this order and submitted a new order for Ampyra 10 mg twice daily to be taken at the noon and -bed time pill calls. However, the Regional Medical Director discontinued this order noting that studies show a slight increase in walking speed noted with this drug.  The Regional Medical Director noted you have an AFO brace; therefore, walking faster may not be safe for you.  The Regional Medical Director noted he needed to know more as to why walking more rapidly is needed.  Ampyra is a non-formulary medication that requires approval by the Regional Medical Director who is authorized to discontinue medications as he deems medically indicated.  A review of your electronic Medication Administration Record indicates you had been prescribed Ampyra since February 2018 and that the Regional Medical Director had approved the previous orders.

6

(ECF No. 1 at 47).  This grievance was found to be with merit and Plaintiff was scheduled for the next available appointment to discuss his Ampyra.  (ECF No. 1 at 47-50).

**OR-19-00357** (March 22, 2019):  Plaintiff grieved that Daniel continues to deny him Gabapentin and Tramadol for pain.  Plaintiff stated that his neurologist, Dr. Khaleel, has repeatedly expressed the need for Gabapentin, but Plaintiff has been denied a long-term pain medication despite having a progressive form of MS.  Plaintiff asked that his need be "placed above monetary concerns" and that he be placed on long-term pain medication.  The response indicates Plaintiff was placed on Norco post-port-placement and Tramadol was discontinued.  Daniel noted that Gabapentin was an off-label use for MS while reviewing Dr. Khaleel's notes.  Plaintiff's grievance was found to be without merit.  (ECF No. 1 at 69-72).

### c.  Daily Showering

**OR-17-00467** (March 29, 2017).  A nurse did not permit Plaintiff the extra time needed to shower.  Found to be with merit.  (ECF No. 1 at 12-14).

**OR-18-00572** (April 25, 2018):  Plaintiff grieved that he was not permitted to take a shower between April 18 - 23, 2018, and, because he has to "use the restroom on himself" he had to smell like urine for five days.  Plaintiff also stated that he needed a cool shower, and the hospital shower will not "go on cold."  In his grievance appeal, he stated he had submitted sick calls but was told to clean up in the sink.  This issue was not permitted to be raised for the first time on appeal.  Plaintiff's original issue was found to be without merit because he had a shower script for Monday, Wednesday, and Friday.  (ECF No. 1 at 33-35).

**OR-18-00684** (May 22, 2018):  Plaintiff grieved that he needed a script to shower daily and had a rash because he could not.  Plaintiff stated his MS specialist had indicated he should shower daily because he uses an "in and out" catheter to deal with his bladder issues, and the lack of

shower privileges can cause an infection.  In his grievance appeal, Plaintiff stated that he soils himself almost daily and Daniel told him to clean himself in the sink.  Plaintiff alleges that doing so will cause him to "get jumped on."  He stated he had suffered from a urinary tract infection for over a month.  The response notes that Plaintiff was seen by Daniel on May 14, 2018, and he noted that Plaintiff self-catheterizes, has pull-ups, and has access to a washcloth and water at all times.  He noted no rash on genitals and minimal redness on the left groin.  There is no discussion of a urinary tract infection.  Daniel denied the need for a daily shower.  Based on this examination by Daniel, Plaintiff's grievance was found to be without merit.  (ECF No. 1 at 39-41).

OR-18-00584 (May 2, 2018): Plaintiff grieved that he needed a cool shower, and that hot water was not indicated for his medical condition.[5]  The medical department confirmed that the hospital shower was not working correctly.  After Plaintiff's grievance appeal, he was permitted to shower in the physical therapy area until the hospital shower was fixed.  The grievance was initially found to be with merit, but it was then found to be without merit because he was permitted to use an alternative, adjustable shower.  (ECF No. 1 at 36-38).

OR-18-00828 (July 1, 2018): Plaintiff grieved he was inappropriately charged two co-pays for the treatment of one urinary tract infection.  In his appeal, Plaintiff stated he would not have "all of the UTI trouble" if he could clean himself as needed.[6]  Plaintiff's grievance was initially found to be with merit; then, after the co-pay was refunded, it was then found to be without merit.  (ECF No. 1 at 45-46).

---

[5] "Excess heat (e.g., warm weather, a hot bath, fever) may temporarily exacerbate [MS] symptoms and signs (Uhthoff phenomenon)."                      https://www.merckmanuals.com/professional/neurologic-disorders/demyelinating-disorders/multiple-sclerosis-ms?query=multiple%20sclerosis.

[6] Although this grievance is primarily about his co-pay, it alleges an inability to clean himself, and is, therefore listed under the shower section.

### d. Wheelchair

**OR-19-00291** (February 27, 2019): Plaintiff grieved that Daniel gave orders for his wheelchair to be taken in retaliation for the multiple complaints Plaintiff had filed against him. Plaintiff states the wheelchair was ordered by his specialist and Daniel went "directly" against that specialist's order. As a result, Plaintiff was not able to ambulate safely and missed pill call and meals. Plaintiff alleges Daniel is attempting to harm or kill him and took the wheelchair without doing an exam or any testing to justify the confiscation. The response indicates Plaintiff was seen by Daniel on February 13, 2019, and he determined that there was no medical necessity for the wheelchair. Further, the medication record indicates he received Tramadol on February 15th and 16th. The grievance was found to be without merit. (ECF No. 1 at 55-58).

**OR-19-00292** (February 26, 2019): Plaintiff grieved that Daniel took away his wheelchair, which he had been prescribed since 2012 due to his MS and had been confirmed as necessary by multiple specialists. The response noted that Plaintiff was seen by Daniel on February 21, 2019, for a urinary tract infection and other issues, and Daniel noted no acute medical need for the wheelchair. The wheelchair was returned to the SCC. The grievance was held to be without merit. (ECF No. 1 at 59-61).

**OR-19-00293** (March 2, 2019): Plaintiff grieved that Nurse Goldman did not assess him when he fell on February 28, 2019. She told an inmate porter that, "It's only Bramlett." The response indicates a statement was obtained by Goldman indicating medical was called when Plaintiff fell. She noted Plaintiff's complaint of arm and wrist pain and that he stated his knees and legs gave out, and that he was not wearing his brace or specialty shoes because he had not received them back. She spoke with Dr. Vowell, and Plaintiff was permitted to keep his wheelchair until the braces and shoes were returned and Plaintiff could be re-evaluated. Plaintiff's grievance was found to be without merit because he was seen and treated for his fall. (ECF No. 1 at 62-64).

9

**OR-19-00358** (March 22, 2019): Plaintiff grieved that he is being retaliated against by medical staff, including Daniel and Stieve. Daniel and Stieve have discontinued medication and denied treatment. Daniel took his wheelchair. The response indicates Plaintiff's wheelchair script was removed because he was seen walking quickly to assault another inmate, therefore, based on clinical data, the wheelchair was determined to be unnecessary. In his appeal, Plaintiff states he had not received any exams since seeing Dr. Khaleel, who had stated the wheelchair was necessary. Plaintiff was not permitted to bring up this new issue on appeal. The grievance was found to be without merit. (ECF No. 1 at 73-76).

### 2.    Exhaustion Disputed

#### a.    Tysabri Infusions

None.

#### b.    Medication and Medical Supply Issues

**OR-17-01459** (August 24, 2017): Plaintiff grieved that Dr. Stieve altered his pain medication based on medical records alone. The grievance was found to be without merit because Plaintiff did not provide sufficient information. Plaintiff was further advised that, as Regional Medical Director, Dr. Stieve "is authorized to discontinue medications and recommend an alternative treatment plan . . . however the provider at your site can override that decision if he/she does not agree with the alternative treatment plan." (ECF No. 1 at 15-17).

Defendants argue that this grievance was not exhausted because Plaintiff did not provide sufficient information for the allegation to be properly addressed. (ECF No. 58 at 9). A relevant section of the ADC policy is not cited to support this argument. As Plaintiff appealed this grievance through all appropriate steps, and his appeal was found to be without merit, the Court finds that this grievance was exhausted.

**OR-18-00172** (January 26, 2018): Plaintiff grieved that Daniel, who is not an MS specialist, had discontinued the medication that had worked for his spasms. He further indicated that Daniel had discontinued or reduced his medications to the point that the MS specialist had characterized Daniel's actions as inhumane. Plaintiff also indicated that Daniel had lied in the records and stated that Plaintiff had asked that medications be discontinued when he had not made such a request. He further states that when he put in sick calls, Daniel told him he was lucky to be getting anything. The response states that he last saw Dr. Daniel on November 28, 2017, therefore his grievance had been filed after the fifteen-day deadline for filing a grievance. (ECF No. 1 at 31-32).

Plaintiff argues that his grievance was not untimely, because he saw a nurse on January 24, 2018, about this issue, so his grievance was in the fifteen-day timeline. The record indicates that Plaintiff saw a nurse on January 24, 2018, stating that the 10mg of baclofen was not working. He wanted his soma and his gabapentin. The nurse indicated that they were unable to communicate with him due to his anger. There is no indication that Defendant Daniel was consulted. (ECF No. 59-3 at 76-77). Based on the grievance response in OR-18-01529 below, however, Plaintiff appears to make a valid point. That grievance response appears to indicate that placing a sick call for a particular issue does affect the deadline calculation under ADC policy. Defendants have not addressed this point, other than to state that the grievance document speaks for itself. (ECF No. 72 at 2). Accordingly, the Court finds, at least for the purpose of this summary judgment motion, that this grievance is exhausted.

**OR-18-01529** (December 11, 2018): Plaintiff grieved that Daniel cut his use of urinary catheters in half, requiring Plaintiff to re-use dirty catheters. Plaintiff indicates this reduction in catheters is contradicted by the latest report from his urologist. Plaintiff states he has a urinary

tract infection that he cannot get rid of and re-using dirty catheters "did not help."  Plaintiff states

Daniel is retaliating against him for filing other grievances about his medical care.  In his appeal,

Plaintiff states he needs at least eight catheters a day, and there is a report from UAMS confirming

this.  The response indicates Defendant Daniel issued Plaintiff a restriction on November 2, 2018,

for enough catheters for four times a day.  The response further states that:

> "[b]etween the time you were issued the restriction and when you submitted your
> Informal Resolution, you were not seen in sick call for complaints of not having
> enough catheters.  Per policy, you are past the allotted time frame to grieve this
> issue; therefore the merits of your appeal will not be addressed at this time."

(ECF No. 1 at 51-54).  The Court finds that, at least for the purpose of this summary judgment

motion, this grievance is unexhausted.

OR-19-00356 (March 22, 2019): Plaintiff grieved that the treatment recommendations of

his MS and neurology specialists were not being followed, and he was being denied Gabapentin

(pain), Soma (spasms), Ampyra (MS) and Tysabri (MS).  This has resulted in excessive pain and

increased falls.  The response states that Plaintiff was last seen regarding his medication requests

on February 13, 2019, therefore the grievance was filed untimely, and the merits were not reached.

(ECF No. 65-68). The Court finds that, at least for the purpose of this summary judgment motion,

this grievance is unexhausted.

### c. Daily Showering

OR-18-00712 (June 2, 2018): Plaintiff grieved that Daniel did not permit a daily shower

and told him it was okay to sit around and soil himself.  Plaintiff stated this practice had caused

him to suffer from urinary tract infections.  The response states that Plaintiff was last seen by

Defendant Danial on May 14, 2018; therefore, his grievance was filed untimely.  (ECF No. 1 at

42-44).

Plaintiff argues that he was seen for a sick call by Nurse Goldman on May 30, 2018, complaining of a urinary tract infection. The exam notes indicate that Goldman verbally consulted with Defendant Daniel and received approval for a urine culture and antibiotics. The exam notes were reviewed by Daniel on June 1, 2018. (ECF No. 59-3 at 52-53). Plaintiff also provided copies of Inmate Request forms wherein he addressed the issue of only three showers per week. (ECF No. 68-2). Defendant Daniel reviewed one of these requests on June 1, 2018, and then stated, "No medical necessity for increased shower days." (ECF No. 68-2 at 3). Again, based on the grievance response in OR-18-01529, Plaintiff appears to make a valid point. Defendants have not addressed this point, other than to state that the grievance document speaks for itself. (ECF No. 72 at 2). Accordingly, the Court finds, at least for the purpose of this summary judgment motion, that this grievance is exhausted.

### d. Wheelchair

None.

### C. Medical Records

Because Plaintiff's medical records are substantial and not well-suited for a succinct summary, they will be addressed as appropriate in the Analysis.

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a

genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  ANALYSIS

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious

14

that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs*, 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id*.

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question regarding whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011)

15

(citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub*, 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

There is no dispute that Plaintiff's MS is an objectively serious medical condition. Material questions of fact exist, however, as to the subjective prong of the test.

### A.  Missed Tysabri Infusions – Defendants Daniel and Stieve

There is no dispute that Plaintiff missed three Tysabri infusions for his MS in November of 2017 and January and February of 2018.[7]  It is also undisputed that Plaintiff exhausted several grievances concerning his missed Tysabri infusions.[8]  Defendants argue that Plaintiff only missed his Tysabri appointments because Consult Scheduler Hart cancelled his November appointment without noting a reason.  (ECF No. 59 at 11).  They further argue the January appointments were missed due to an issue with his TOUCH program enrollment,[9] for which neither Defendant Daniel nor Defendant Stieve were responsible.

The summary judgment record is unclear as to who was responsible for maintaining Plaintiff's TOUCH program enrollment.  It appears that Defendant Daniel, or some other authorized medical staff, needed to open a consult request, which could be done as "open" so that multiple infusions could be done under one request.  (ECF No. 58 at 19).  Daniel did so on October 31, 2017, but it is not clear if he had any role in making sure the consults occurred.  The Consult

---

[7] Plaintiff alleges there were more, and correctly points out that Defendants have admitted that outside appointments have been marked as held when they were not.  *See* ECF No. 59-7 at 2.

[8] This includes grievances where he only referenced Medical or Staff, but the merits of his claim were still reached.

[9] The TOUCH program was developed with the FDA for the restricted distribution on Tysabri.  (ECF No. 59-7 at 1).

Scheduler was then to arrange the appointments, and work with the TOUCH program. (ECF No. 58 at 19). It appears Defendant Stieve was involved in deciding medical necessity for the Tysabri. (ECF No. 59-6 at 2). Yet the TOUCH documentation indicates that the physician prescribing the Tysabri, in this case neurologist Dr. Khaleel, was responsible for determining if the patient should continue on Tysabri every six months, and if so, authorize the treatment. (ECF No. 68-7 at 4). Defendants also argue there were no notations placed in Plaintiff's record by Dr. Atiq, a physician at the Arkansas Cancer Center where the Tysabri infusion was administered, which would indicate that there were issues with Plaintiff's Touch enrollment status. (ECF No. 58 at 19). There is also dispute as to whether Plaintiff stated that he wanted to discontinue Tysabri after he got an infection in the infusion port in October 2018. (ECF No. 58 at 22.) Plaintiff states he "said no such thing." (ECF No. 68 at 25).

Defendants further argue that Plaintiff was not harmed by any missed infusions, as his medical records indicate that his MS is stable. (ECF No. 58 at 23). They argue that the infusions do not help stop progression of the disease, but merely prevent relapses.[10] (*Id.*). They argue that there was no interval progression of brain plaques in Plaintiff's MRI reports, thus Plaintiff's MS was stable. (*Id.* at 22-23). Defendants also argue that Dr. Khaleel noted that Plaintiff was showing a "great response" to the Tysabri infusions. (ECF No. 59 at 14). Dr. Kerstein, another WellPath, LLC physician, reviewed Plaintiff's record and opined that the missed doses had "no documented ill effect on Plaintiff's overall condition." (ECF No. 59-11 at 5).

Dr. Khaleel's notes on May 18, 2018, indicate that Plaintiff is doing well on monthly Tysabri infusions, and his brain plaques have been stable since the inception of the Tysabri therapy.

---

[10] The manufacturer website for Tysabri states that the infusion slows the progression of physical disability, reduces the formation of new active brain lesions, and reduces the number of relapses. https://www.tysabri.com/ en_us/home/about/choosing-tysabri.html. (Last accessed July 22, 2021).

(ECF No. 59-5 at 14).  He summarizes the visit by stating that Plaintiff is showing a "great response" to the monthly Tysabri infusions and baclofen twice a day.  (ECF No. 59-5 at 16).  In August 20, 2019 Plaintiff states that Plaintiff's MS appears to be "pretty stable on monthly Tysabri."  (ECF No. 59-5 at 43).  Plaintiff complained of a worsening ability to walk, but Khaleel was not able to confirm this on the examination.  He also notes that Dr. Daniel "gave him a real perspective of his behavior inside the Prison even though he pretends to be weak due to multiple sclerosis."  (*Id.*).

Plaintiff points out that Dr. Khaleel notes he is doing well while he in on the proper monthly infusions.  (ECF No. 68 at 20).  The Court also notes that, while Dr. Khaleel indicated a "great response," there are no notations in his records concerning the effects or non-effects of the missed infusions.

Plaintiff filed several sick calls after missing his Tysabri infusions, complaining of pain, spasm, and relapse due to the missed infusions.  Plaintiff was seen at a sick call on January 5, 2018, complaining of terrible muscle spasms in his back and legs, which prevent him from getting any rest.  He notes that he had missed an appointment with Dr. Khaleel, and it had not been rescheduled.  (ECF No. 59-3 at 80-81).  He also notes that his Tysabri appointment scheduled for that day had been cancelled.  (*Id.*).  Plaintiff was seen at sick call on January 8, 2018, complaining of terrible muscle spasms in his back and legs.  He asked for soma and for an appointment with his neurologist so he can get back on his Tysabri infusions.  (ECF No. 59-3 at 80).

Plaintiff was seen at sick call on January 18, 2018, with the following statement:

I am in pain I feel like I am on fire.  My feet feel like that wet like my shoes are full of water and I am losing control of my legs. I have g[o]t real numb the last couple of weeks. I am falling trying to get up in the morning and having real bad leg and back spasms that are killing me.  I think I am having a relapse.

(ECF No. 59-3 at 77).  Plaintiff was seen at sick call on January 24, 2018, angrily complaining that his MS symptoms are worsening.  (ECF No. 59-3 at 76).  Plaintiff was seen at sick call on January 26, 2018, complaining of muscle spasms and severe intolerable pain.  He stated his symptoms were caused by not getting his treatments from the specialist.  (ECF No. 59-3 at 74).

Plaintiff further argues that small, or even undetectable, changes in lesions can have substantial effects, and cites to documents from the Multiple Sclerosis Society in support, as well as his own self-reports of symptoms and requests for care.  (ECF No. 68-3, 68-4).  He blames another set of missed Tysabri infusions for his inability to rotate his left eye in its orbit.  (ECF No. 68 at 14).[11]  He further argues that neither Defendant Daniel nor Dr. Kerstein are MS specialists, as Defendant Stieve is an OB/GYN, while Dr. Kerstein is an osteopath.  Further, both are WellPath employees.  (ECF No. 68 at 1516).  Review of affidavit resumés confirms this to be correct as to Kerstein.  (ECF No. 59-11).  The Court was unable to confirm this allegation as to Defendant Stieve.

Thus, based on the summary judgment record before it, material questions of fact remain as to who was responsible for the missed infusions and whether those missed infusions caused pain, spasm, relapse, or any lasting detrimental effects to Plaintiff's condition or prognosis. Indeed, it is doubtful that the progression or non-progression of Plaintiff's MS, and any possible effect on that progression from the missed Tysabri infusions can be determined without the input of an expert witness who is an appropriate specialist and who is not employed by WellPath, LLC. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (whether a particular medical situation

---

[11] Plaintiff also argues that the MRI taken on April 2, 2019, says he was "moderately motion compromised," whereas his October 2020 MRI says he was "excessively motion compromised."  (ECF No. 68 at 14-15).  A review of these MRI reports indicates that these comments referred to the quality of the MRI study, not Plaintiff's ability to move. (ECF No. 59-3 at 140; 59-11 at 18).

constitutes deliberate indifference or non-actionable negligence is often "a factual question requiring exploration by expert witnesses.").

Accordingly, material questions of fact remain concerning the missed Tysabri infusions, and summary judgment on that issue is not appropriate as a matter of law.

## B.  Delay or Denial of Medical Supplies and MS Treatment

A prison physician may exercise his or her own independent professional judgment when choosing not to follow the recommendations of outside specialists. *Dulany v. Carnahan*, 132 F.3d 1234, 1241 (8th Cir. 1997).  At the same time, "[g]rossly incompetent or inadequate care can also constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (quoting *Smith,* 919 F.2d 90 at 93) (cleaned up).  A recurring pattern of non-specialist prison medical staff ignoring or modifying the treatment recommendations of outside specialists can support a finding of deliberate indifference.  *See Miller v. Schoenen*, 75 F. 3d 1305, 1310-11 (8th Cir. 1996) (material issue of fact as to whether the prison medical staff acted with deliberate indifference when they refused to provide the mandatory chronic care prescribed by outside specialists for an inmate with a heart transplant over a period of years); *see also Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials ignored the recommendations of treating specialists for two years and instead relied on the opinions of non-specialist and non-treating medical officials who based their decisions on their own non-specialized conclusions); *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002) (upholding district judge's bench trial finding that jail medical staff's repeated refusal to follow the treatment recommendations of Parkland Hospital physicians for a paraplegic inmate constituted deliberate indifference); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (prison physician's refusal, on more than one occasion, to follow

the advice of treating neurologist and neurosurgeon for Plaintiff's painful medical condition required reversal of district court's grant of summary judgment in his favor).

The summary judgment record shows a recurrent pattern of Defendants Daniel and Stieve, neither of whom are neurologists nor MS specialists,[12] disregarding the recommendations of Plaintiff's outside specialists regarding his MS treatment. For example, Dr. Khaleel, Plaintiff's treating neurologist, added 10 milligrams of Ampyra twice a day to Plaintiff's drug regimen on February 19, 2018. (ECF No. 59-5 at 9). Dr. Khaleel stated that he was prescribing Ampyra "to help relax his muscles." (*Id*.). On May 14, 2018, Dr. Khaleel's specialty provider report states he is to continue the 10 milligrams of Ampyra. (ECF No. 59-5 at 13).

On November 2, 2018, Dr. Stieve questioned the need for Ampyra, noting that "studies show that a slight increase in walking speed noted with drug," and questioned whether it was safe for Plaintiff to walk faster. Dr. Stieve testified in his affidavit that he "saw an order" for the drug in Plaintiff's records and "recalled studies with this drug in regard to MS." (ECF No. 59-8 at 2). He did not testify that he read Dr. Khaleel's notes, contacted Dr. Khaleel, or that he obtained and re-read the articles in question before recommending that the drug be discontinued. Plaintiff filed Grievance OR-18-01469 on November 19, 2018, stating that Defendant Daniel is trying to kill him because he keeps taking him off his MS medication. The grievance was found to be with merit, and Plaintiff was scheduled for an appointment to discuss his Ampyra. (ECF No. 1 at 47-50).

On February 13, 2019, Dr. Daniel wrote:

> medical staff, upon further consideration and thinking about and discussing the situation *with each other* in detail has decided that the patient's Ampyra is not a medical necessity. This decision was discussed with the patient who disagreed with the decision and started a formal grievance process. I was asked by Sheila Byers, Medical Grievance Coordinator, to see the patient to answer the [following] questions proposed by Dr. Stieve.
> - Need to know more why walking rapidly is needed?

---

[12] Defendants have provided no documentation indicating expertise in either of these areas.

- Pt. has AFO brace?  Not sure why walking faster safe for inmate.

(ECF No. 59-3 at 7-8) (emphasis added).  On that same visitation note, Dr. Daniel also stated that Plaintiff was seen on video walking to assault another inmate and noted "[d]eception and lying to ADC & medical staff."  (*Id*.).  The Court notes that Defendant Daniel only wrote that he spoke with other WellPath medical staff.  He did not state that he consulted Dr. Khaleel.  Plaintiff filed Grievance OR-19-00356 on March 22, 2019, stating that the Ampyra and several other of the drugs prescribed by his specialists were not being provided.  As it was filed untimely, the merits were not reached.  (ECF No, 1 at 65-68).

On March 7, 2019, Dr. Khaleel noted that Plaintiff's prescriptions did not include the previously prescribed gabapentin[13] or tegratol.  He added 600 milligrams of gabapentin nightly back to Plaintiff's routine.  (ECF No. 59-5 at 34).  On March 14, 2019, Dr. Daniel stated that gabapentin is "an off-label use for MS & therefore will not use."  (ECF No. 59-3 at 2).  On March 22, 2019, Plaintiff filed Plaintiff filed OR-19-00357, complaining that Defendant Daniel continues to deny him gabapentin and tramadol, despite Dr. Khaleel repeatedly prescribing them.  (ECF No. 1 at 69-62).  The grievance was found to be without merit because Daniel had noted that the gabapentin was off-label and prescribed another pain medication.  (*Id*.).

On May 13, 2019, Dr. Khaleel prescribed Flexeril and 600 milligrams of gabapentin.  (ECF No. 59-5 at 38, 41).  Plaintiff has provided documentation from the National Multiple Sclerosis Society noting that gabapentin is indicated for pain and spasm caused by MS.  (ECF No. 68-4).  On May 21, 2019, Defendant Daniel texted Dr. Khaleel, stating that gabapentin is a much-abused drug in prison, and he is only permitted to use it as directly indicated on the label.  Dr. Khaleel

---

[13]  The brand name for this drug is Neurontin, which Dr. Khaleel indicated on one prescription. https://www.pdr.net/drug-summary/Neurontin-gabapentin-2477.4218. (Last accessed July 21, 2021).

replied that if Plaintiff was getting baclofen, then gabapentin was not needed. (ECF No. 72-1 at 3).

Although the summary judgment record only includes direct clinic notes from Dr. Khaleel for 2018 and 2019 (ECF No. 59-5), Plaintiff's institutional medical records indicate that he was seen for outside neurology consults with Dr. Khaleel in 2017 as well. (ECF No. 59-5 at 1-3). On August 22, 2017, Dr. Daniel saw Plaintiff for a chronic care visit. During that visit, his current MS prescriptions – presumably those of his outside specialist Dr. Khaleel - were reviewed. Dr. Daniel decided to stop the gabapentin for nerve pain and increase his tramadol from two to three times daily for a month. Daniel alleges that Plaintiff agreed to this approach. (ECF No. 59 at 9). Plaintiff alleges that he did, but only if other medication was increased. (EC No. 68 at 15). Dr. Stieve reviewed the prescription on August 23, 2017, and agreed with the cessation of the gabapentin, but not with the use of tramadol. He recommended that Dr. Daniel prescribe duloxetine instead. (ECF No. 59 at 9). Because both tramadol and gabapentin can be habit-forming, and because tramadol is a narcotic, Dr. Stieve did not believe their use was "a good idea." (ECF No. 59 at 9). He testified in his affidavit that, because patients do not usually develop a tolerance for duloxetine, it "would be worth giving it a try." (ECF No. 59-8 at 2). On August 28, 2017, Dr. Daniel prescribed duloxetine in place of gabapentin. (ECF No. 59 at 9). Neither Defendant testified that they consulted with Dr. Khaleel prior to making this modification to Plaintiff's pain medication. (ECF No. 59-9).

Plaintiff filed Grievance OR-17-01460 on August 23, 2017, and OR-17-01459 on August 24, 2017, in response. OR-17-01460 was found to be with merit because his tramadol and gabapentin were stopped, and the alternative pain medications of duloxetine and baclofen were not prescribed until several days later, on August 28, 2017. (ECF No. 1 at 18). Plaintiff was seen

at a sick call on August 29, 2017, complaining of pain because his pain medications were stopped by "someone he hasn't seen." The notation indicated the medication was stopped by Dr. Stieve. (ECF No. 59-3 at 100-01). Defendant Daniel placed Plaintiff back on tramadol on October 9, 2017. (ECF No. 59 at 10). He testified that he "started" Plaintiff on baclofen in late November 2017.[14] (ECF No. 59-9 at 2). Dr. Vowell renewed the tramadol and baclofen in early January 2018. (ECF No. 59 at 10-11).

Regarding shower frequency, on May 14, 2018, Dr. Khaleel recommended that Plaintiff be provided with a daily showering facility due to his urinary continence. (ECF No. 59-5 at 13). He further indicated that his shower temperature should be set at no more than 80 degrees Fahrenheit. (ECF No. 59-5 at 16). The shower temperature recommendation was repeated on September 7, 2018. (ECF No. 59-5 at 23). That same day, Defendant Daniel reviewed Dr. Khaleel's recommendations and denied the need for a daily shower, stating: "He self-caths. He has pull-ups. He has access to a washcloth & water at all times." (ECF No. 59-3 at 54-56). Defendants further argue that the hot water[15] in the barracks shower takes "a moment" for the water to warm up, therefore, "in the 10 seconds it would take for Plaintiff to rinse the urine off himself, he would rarely have hot water; and even if he did, 10 seconds of hot water, either rinsing directly or wiping with a washcloth, would not harm him." (ECF No. 59 at 16). They provide a record from the University of Arkansas for Medical Sciences ("UAMS") which states that his catheter may be washed with mild soap and water; it did not need to be sterile. (ECF No. 59-3 at 123). Defendants further argue that Dr. Khaleel and Dr. Daniel both recommended that a Foley

---

[14] This testimony contradicts the response in OR-17-01460, which stated that Plaintiff received baclofen in August 2017. Daniel testified that in August 2017, he "was going to add baclofen (muscle relaxant), but the patient was still taking soma. (ECF No. 59-9 at 2).

[15] The summary judgment record indicates that Plaintiff must shower in the hospital or physical therapy area in order to access a cool shower; the temperature of the barracks showers are not adjustable.

catheter, which remains in place and drains to a bag, would address the issue of urine leakage and the need for self-catheterization, but Plaintiff refused to wear it. (ECF No. 59 at 18).

The summary judgment record is replete with grievances, sick calls, chronic care exam notes, and outside provider notes concerning Plaintiff's recurrent urinary tract infections, as well as denials of Plaintiff's requests for a daily shower. Plaintiff argues that the inability to shower daily in cool water, as well as the need to re-use catheter supplies is causing his urinary tract infections. Plaintiff further argues that the barracks has 46 men in it, so the water is always running and therefore always hot – except perhaps for the middle of the night. He further argues that 10 seconds of nerve pain is the equivalent of grabbing an electric fence. (ECF No. 68 at 23). Plaintiff provides photos of the package labels for his catheter supplies, all of which indicate they are single-use only. (ECF No. 66-4, 66-5). It is also not clear from the summary judgment record if Plaintiff had access to the appropriate "mild soap" noted in the UAMS record to clean a catheter. Plaintiff argues that he was not able to tolerate the Foley catheter, which he states is not uncommon. (ECF No. 68 at 25). He further argues that he did not have any issue with urinary tract infections for years under the former medical provider Corizon, whose staff provided him with the proper supplies. (*Id.*).

This leaves the short-term confiscation of his wheelchair for review. Plaintiff argues that he has been the recipient of a wheelchair from the Arkansas Spinal Cord Commission since 2012. (ECF No. 1 at 59-61). He further argues that SCC only provides wheelchairs for "unquestioned medical need," and he is aware of no other case where an inmate had an SCC wheelchair confiscated. (ECF No. 68 at 32). Dr. Atiq, Plaintiff's Tysabri and internal medicine specialist at the Arkansas Cancer Institute, diagnosed Plaintiff as wheelchair-dependent on April 3, 2018; May 1, 2018; June 31, 2018; July 12, 2018; August 9, 2018; October 18, 2018; December 20, 2018;

January 24, 2019; and May 28, 2019, (ECF No. 59-6 at 20, 26, 29, 37, 41, 51, 60, 68, 81). According to consultation request notes, on August 14, 2017, Dr. Atiq recommended that Plaintiff have a return consult with Dr. Khaleel due to increased bilateral lower extremity weakness. (ECF No. 59-5 at 3). Dr. Khaleel noted that Plaintiff required a wheelchair "for 365 days" on March 7, 2019. (ECF No. 59-5 at 27). Dr. Khaleel noted that he should "continue to have his ability to have his wheelchair at this time where he resides" on May 13, 2019, and on August 20, 2019. (ECF No. 59-5 at 39, 43). Thus, Plaintiff's outside medical specialists have consistently noted that he requires a wheelchair, both before and after the confiscation incident.

On February 13, 2019, Dr. Daniel determined there was no medical necessity for Plaintiff to have a wheelchair, noting "[d]eception and lying to ADC & medical staff." (ECF No. 59-3 at 7-9). Daniel made this decision after viewing a video of an incident where allegedly Plaintiff rose from his wheelchair, walked to another inmate, and struck him before walking back to his chair. (ECF No. 59 at 21).[16] Plaintiff's wheelchair was taken on February 21, 2019. (ECF No. 59-3 at 6). Plaintiff argues that prior to this decision, Defendant Daniel noted that Plaintiff had been able to get around by pushing the wheelchair, but now was unable to get around by walking on September 27, 2017. (ECF No. 59-3 at 96). On October 9, 2017, Defendant Daniel had noted that Plaintiff could walk but was "very uncoordinated." He also noted that Plaintiff's foot drop was improved with the new brace. (ECF No. 59-3 at 94). Plaintiff argues that these notations of gait irregularities by Daniel occurred prior to any "strife" between Plaintiff and Defendant Daniel. (ECF No. 68 at 29).

On February 28, 2019, Plaintiff fell in the hallway. Dr Vowell gave him back a wheelchair until his brace and shoes came in and stated he would be re-evaluated concerning the wheelchair

---

[16] Defendants are not able to produce the video for the summary judgment record because the ADC cannot locate it to produce a copy. (ECF No. 71-1 at 2).

at that time.  (ECF No. 59-3 at 4).  On March 14, 2019, Defendant Daniel renewed Plaintiff's wheelchair prescription for another year.  (ECF No. 59 at 21-22).

Based on the summary judgment record before the Court, a material question of fact exists as to whether this recurrent pattern of disregarding Plaintiff's outside specialists constituted deliberate indifference.

### C.  WellPath, LLC and Official Capacity Claims

WellPath, LLC argues that it should be dismissed as a Defendant, and Plaintiff's official capacity claims against Defendant Stieve and Daniel should be dismissed, because Plaintiff has not provided evidence of a WellPath custom or policy which harmed Plaintiff.  (ECF No. 58 at 43).

A claim of deprivation of a constitutional right cannot be based on a *respondeat superior* theory of liability.  *See Monell v. Department of Social Services*, 436 U.S. 654, 694 (1978).  "[A] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity."  *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see also Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997) ("general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability").  "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.  To establish personal liability of the supervisory defendants, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights."  *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)); s*ee also Kulow v. Nix*, 28 F.3d 855, 859 (8th Cir. 1994) ("if any claim of medical indifference . . . is to succeed, it must be brought against the individual directly responsible for [Plaintiff's] medical care.").

Defendant Wellpath correctly states that Plaintiff has not identified a specific written policy of Wellpath which has deprived Plaintiff of his rights concerning medical care. As the Court noted in its previous report and recommendation, a written policy is not necessarily required to support a claim against Wellpath. A custom conflicting with a written policy can support an official capacity claim. *Johnson v. Douglas County Med. Dept.*, 725 F.3d 825, 829 (8th Cir. 2013). However, to establish the existence of such a custom, Plaintiff must demonstrate:

> 1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> 2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and,
>
> 3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Id.* at 828. Under this standard, "multiple incidents involving a single plaintiff could establish a custom if some evidence indicates that the incidents occurred over a course of time sufficiently long to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Id.*

As the Court noted in its previous report and recommendation, the volume of grievances spanning a two-year period, combined with the involvement of both the Regional Director and the unit physician, permits the inference that Daniel and Stieve, on behalf of and with the tacit authorization of Wellpath, engaged in treatment denials and delays to avoid providing Plaintiff necessary medical care for his MS. Further, there is a clear pattern where many of Plaintiff's ADC grievances were found to be with merit initially, and the care issue was addressed by WellPath only after the ADC grievance was filed.

The response to Grievance OR-18-01469 identifies a custom or policy that Defendant Stieve, as Regional Medical Director, must approve any non-formulary medications.  (ECF No. 1 at 47).  The phone text discussion between Defendant Daniel and Dr. Khaleel further indicates that WellPath has a custom or policy wherein drugs cannot be given to inmates unless they are directly indicated on the label,[17] apparently even when prescribed by a specialist.  (ECF No. 72-1 at 4). The summary judgment record discussed in the sections above indicate that Defendants Stieve and Daniel, either individually or in tandem, have regularly denied or modified the treatment recommendations of Plaintiff's specialists under these policies or customs.

The Court must view the facts and all reasonable inferences in the summary judgment record in the light most favorable to the Plaintiff.  As such, questions of material fact remain as to WellPath's policies and customs and their effect on Plaintiff's medical care.

### D.  Retaliation

Plaintiff alleges that the confiscations and denial of care were a "vindictive retaliation" in response to his use of the ADC grievance process to protest their denial of medical care.  (ECF No. 1 at 9, 51, 55, 73).

The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.  *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994).  In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)).  The retaliatory conduct itself need not be a constitutional violation to be actionable. Additionally, there is no independent injury requirement when retaliatory conduct is involved.  *See Dixon*, 38 F.3d at 380.

---

[17] The FDA permits healthcare providers to prescribe a drug for an unapproved or "off-label" use when they judge that it is medically appropriate for their patient.  www.fda.gov (Last accessed July 23, 2021).

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity"; and (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 807-8 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

First, there is no question Plaintiff engaged in a protected activity when he submitted medical requests and grievances. However, as to the second part of this analysis, the summary judgment record does not reflect that Plaintiff was at any time or in any way "chilled" from continuing in the protected activity. In addition, Plaintiff has not presented any summary judgment evidence to support his actual retaliation claims. *See Meuir v. Greene County Jail Emples.*, 487 F.3d 1115, 1119 (8th Cir. 2007) ("Merely alleging that an act was retaliatory is insufficient."). Indeed, the summary judgment record indicates the confiscation of the wheelchair appears was prompted by a video of Plaintiff leaving his wheelchair to strike another inmate, for which he received a disciplinary charge. Striking another inmate is decidedly not a protected activity.

Considering the summary judgment record, Plaintiff has failed to establish he suffered any adverse action. *See Murphy v. Mo. Dept. of Corr.*, 769 F.2d 502, 503 n. 1 (8th Cir. 1985) (holding an inmate bears a heavy evidentiary burden in establishing a prima facie retaliation case). There is no question of material fact, and Defendants are entitled to summary judgment as a matter of law as to Plaintiff's retaliation claims.

## IV.  CONCLUSION

Accordingly, it is recommended that Defendants' Motion for Summary Judgment (ECF No. 57) be GRANTED IN PART and DENIED IN PART. Plaintiff's retaliation claims against all

parties should be DISMISSED WITH PREJUDICE.  All other claims should remain for further review.[18]

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **26th day of July 2021**.

/s/ *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE

---

[18] As there are federal claims remaining for review, the supplemental state claim should remain as well.